UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | Crim. No. 16-10258-ADB |
| v. ) | |
| ) | |
| FRANCIS P. SALEMME and ) | |
| PAUL M. WEADICK, ) | |
| ) | |
| Defendants. ) | |

AFFIDAVIT OF JOHN FANNING IN SUPPORT OF
PRE-TRIAL DETENTION OF PAUL M. WEADICK

I, John Fanning, having been duly sworn, states:

1. I am a Massachusetts State Police Officer and have been a police officer since 2002. I am presently assigned to the State Police Detective Unit (SPDU) at the Norfolk County District Attorney's Office and have been so since 2012. I am trained in criminal investigation including, specifically homicides/death investigations and crime scene investigation. In addition to my assignment in the Division of Investigative Services, I have been assigned to Field Services in Troops A and H. During that time, I have investigated and processed serious and violent crimes, including murder, suicides, sudden, suspicious, and unattended deaths, along with drug investigations. Through these investigations, I have been the affiant and participated in the execution of search warrants from which various types of evidence have been seized. I have received specialized training and experience in the collection of physical evidence, crime scene processing and the investigations of such cases. I also have a Bachelor's Degree in Criminal Justice from Curry College.

2. I make this affidavit in support of the pre-trial detention of Paul M. Weadick. In my capacity as an investigator assigned to the State Police Detective Unit (SPDU) at the Norfolk

County District Attorney's Office, I have participated in the investigation into the murder of Steven A. DiSarro. I have been assigned to this homicide investigation since DiSarro's remains were recovered in March of this year. I have personally participated in the interviews of several of the key witnesses in this case and obtained information contained in this affidavit from my law enforcement colleagues assigned to this case.

3. Based upon my investigation, I have learned that the defendant Weadick was charged with the 1982 murder of Joseph Mistretta. Mistretta was shot to death and his body was recovered in the trunk of a vehicle outside Weadick's residence. At the time of his arrest, Weadick was trying to clean up the blood inside the residence and had blood on his hands. Weadick was eventually convicted of Manslaughter in the First Degree and sentenced to five to ten years' incarceration.

4. After Weadick was released from prison in 1989, he became a close associate of Francis Salemme and his son, Francis Salemme, Jr. In fact, he obtained employment as a manager at The Channel based upon his association with Salemme, Jr. I know Salemme to have been the boss of the New England La Cosa Nostra (NELCN) or "mafia" and Salemme, Jr. to have been a soldier or "made member."

5. I am familiar with the statements of Stephen Flemmi regarding the murder of DiSarro. Flemmi has stated that he was a longtime criminal associate of Salemme.[1] He stated that he was approached by Salemme to assist Salemme in obtaining a license to operate The Channel

---

[1] Flemmi is currently serving a life sentence in a federal prison as a result of his conviction for RICO/murder and other crimes. See United States v. Francis Salemme, et al., Crim. No. 94-10287-MLW and United States v. James Bulger and Stephen Flemmi, Crim. No. 99-10371-DJC.

in South Boston.  Salemme offered Flemmi "a piece" of the club if Flemmi could assist in this fashion.  Flemmi spoke with James Bulger about The Channel, and they assisted Salemme in obtaining the license.

Once the club opened it attracted tremendous law enforcement attention.  Salemme believed that DiSarro was under investigation and told Flemmi that he had seen DiSarro meeting with federal agents.  Salemme was concerned that DiSarro could jeopardize his son.[2]  As a result, Flemmi became suspicious that DiSarro's days were numbered.

Shortly thereafter, Flemmi went to Salemme's home in Sharon.  Flemmi explained that at that time Flemmi resided in Norwood, a ten minute ride from Salemme's home, and Flemmi frequently met with Salemme at Salemme's Sharon home.  As Flemmi arrived at Salemme's home, he observed Salemme, Jr. and DiSarro entering the rear of the house.  Flemmi parked his car and entered the house several minutes later.  As Flemmi entered the house he observed Salemme, Jr. strangling DiSarro.  He also observed Paul Weadick holding DiSarro's legs.  Frank and Jack Salemme were also present observing the strangulation of DiSarro.  Once Flemmi saw what was happening, he told Salemme that he (Flemmi) would meet with him (Salemme) later and left the premises.

Later that day, Flemmi did meet with Salemme.  Salemme advised Flemmi that after DiSarro's murder, Salemme and his brother Jack had taken DiSarro's body to a construction site in Rhode Island and disposed of the body.  Salemme said that DeLuca was present at the construction site.  They let Salemme, Jr. and Weadick go into Boston so that they (Salemme,

---

[2] At the time, Salemme Jr. was under indictment.  The government moved for detention because of Salemme, Jr.'s involvement in a brawl at The Channel subsequent to Salemme, Jr.'s release on conditions.  As a result, the relationship between the Salemmes and The Channel became subject to public scrutiny.

Jr. and Weadick) could be seen and have an alibi in case they were accused in connection with DiSarro's disappearance.

6. I have also participated in an interview of Robert DeLuca, a "capo" or captain in the New England La Cosa Nostra or the "mafia."[3] Deluca has stated that during a meeting he had in Providence, Rhode Island with Salemme, he was advised that Salemme suspected Disarro was both stealing from his business, The Channel Nightclub, and was cooperating with federal law enforcement. According to Deluca, he told Salemme Senior to "get rid of him." Deluca stated that Salemme was going to have "Frankie Boy" take care of it, and that this conversation occurred approximately a week or two prior to DeLuca being contacted by Salemme to assist with the disposal of Disarro's body.

Deluca stated that one night in May of 1993 he received a coded page from Salemme. Deluca recalled returning the page and being told by Salemme that he had to be ready to receive a package and that he should dig a hole in advance. Deluca understood "package" to mean a body, but was unsure about the victim's identity. Deluca explained that Salemme was involved in numerous murders and at that time was engaged in a series of killings. DeLuca believed that he could not refuse to get involved in the disposal of the body because

---

[3] DeLuca was indicted with Salemme and six others in the "Bulger case" in 1995. See United States v Salemme et al, 94-10287-MLW. Several months after his arrest, DeLuca was indicted for extortion in the District of Rhode Island. In 1999, he pled guilty in both cases and received a sentence of 126 months' incarceration on the R.I. case and 34 mos. incarceration on the Bulger case.

On February 10, 2011, Robert P. Deluca was indicted in the District of Rhode Island and charged with RICO conspiracy, conspiracy to engage in extortion and extortion. DeLuca cooperated in that matter against several NELCN members who were charged with extorting Providence strip clubs. He pled guilty and received a sentence of one days' incarceration.

DeLuca has recently been indicted for lying in 2011 about his role and knowledge of the disappearance of DiSarro. See United States v. DeLuca, Crim. No. 16-10186-DJC.

to do so would result in his own death. Deluca told his brother, Joseph, about the call and Joseph volunteered to meet with Salemme and take custody of the body.

Deluca stated that within days of receiving the call from Salemme, Joseph DeLuca and others received DiSarro's body from Salemme in North Providence, Rhode Island. Later that night, Joseph DeLuca and others disposed of DiSarro's body in a hole that had been dug behind an old mill building located at 715 Branch Avenue in Providence, Rhode Island.

Deluca stated that after the disposal of DiSarro's body, Salemme told him that "Frankie Boy" (Salemme, Jr.) had strangled DiSarro while Paul Weadick held Disarro's legs.

7. I am familiar with the statements of Pamela DiSarro, the wife of Steven DiSarro. On the morning that Steven disappeared, Pamela observed that he was picked up outside his home by a person operating a vehicle she described as a "red jeep." I am also familiar with the statements of Becky O'Dean, the former girlfriend of Salemme, Jr. O'Dean has stated that she owned a red Isuzu that was frequently used by both Salemme, Jr. and Weadick. O'Dean stated that around the time of DiSarro's disappearance, her vehicle disappeared for a few days and she later found it parked in the driveway of Salemme Jr.'s Sharon home.

8. Weadick currently is employed by Modica Associates. I am informed by FBI Special Agent Jeffrey Cady that David Modica is an associate of several NELCN figures including Carmen and Anthony DiNunzio. Carmen DiNunzio was the former boss of the NELCN who was recently released from prison. A pen register on Modica's telephone in 2005 confirmed these associations.

9. Weadick's propensity for violence is demonstrated not only by his participation in the two murders mentioned above, but also by his close association with the leaders of the NELCN. That relationship alone demonstrates that Weadick would willingly engage in

crimes of violence at the direction of Salemme and other LCN members and associates. Therefore, I believe that Weadick represents a danger to the community.

10. Furthermore, I believe that Weadick represents a serious risk of flight. Salemme, understanding the gravity of the current charges, was recently apprehended in Milford, Connecticut after having disappeared from his residence in Atlanta, Georgia. Having now been indicted and facing a sentence of life in prison, Weadick has a great incentive to flee. As an international organization, La Cosa Nostra has the resources to finance and sustain members and associates who choose to evade prosecution by becoming fugitives. With crime Families located in different cities throughout the United States, as well as in other countries, the LCN maintains a number of safe locations in order to facilitate the flight and concealment of fugitive members. Examples of members of organized crime who have fled this jurisdiction to avoid prosecution include:

   1. LCN soldier Dennis Lepore in 1989;

   2. LCN soldier Angelo "Sonny" Mercurio in 1989;

   3. LCN associate Joseph Yerardi in 1993;

   4. Francis Salemme in 1995; and

   5. James Bulger in 1995.

11. Finally, I believe that there is a serious risk that, if released pending trial, Weadick would engage in acts of obstruction of justice. The instant offense is one where Weadick participated in the murder of an individual who could implicate members and associates of the NELCN in violations of federal criminal laws.

In light of all of the foregoing, I believe that there is no condition or combination of conditions that will ensure the safety of individuals and the community, will ensure

Weadick's appearance at trial, and will ensure that Weadick does not engage in acts to obstruct justice.

                                                                                          _____
Trooper John Fanning
Massachusetts State Police

Sworn and subscribed to before more this 8th day of
September, 2016.

                                        _____
UNITED STATES MAGISTRATE JUDGE

## **CERTIFICATE OF SERVICE**

  I, Fred M. Wyshak, Jr., Assistant United States Attorney, do hereby certify that this document, was filed on the above date through the ECF system which sends copies electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and that paper copies will be sent to those indicated as non-registered participants on this date.

                /s/ Fred M. Wyshak, Jr.
                FRED M. WYSHAK, JR.
                Assistant U.S. Attorney